**This order is SIGNED.**

**Dated: April 1, 2021**



**R. KIMBALL MOSIER**
**U.S. Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| In re: | |
| RJT REAL ESTATE HOLDINGS, LLC, | Bankruptcy Case No. 18-29037 |
| Debtor. | Chapter 11 |
| RJT REAL ESTATE HOLDINGS, LLC, | Hon. R. Kimball Mosier |
| Plaintiff, | |
| v. | |
| GARY E. DAVIS, personally and as Trustee of the Gary E. Davis Revocable Trust, and John Does 1-3, | Adversary Proceeding No. 20-2019 |
| Defendants. | |

## MEMORANDUM DECISION

This adversary proceeding brings a state-law contract dispute before this Court for resolution on summary judgment. In 2009, the Gary E. Davis Revocable Trust Dated October 1, 2008, of which Defendant Gary E. Davis is the trustee, entered into a contract to sell real property to the predecessor in interest of Plaintiff RJT Real Estate Holdings, LLC (RJT). According to RJT, the property was not in the condition it had bargained for and, as a result, the parties agreed to

orally modify the contract terms. Davis denies the existence of the modification and, after RJT had not kept up with payments he asserted were due under the contract, he declared default and sought to sell the property. RJT filed bankruptcy in December 2018 in an attempt to protect the property from foreclosure.

Once in bankruptcy, RJT filed a complaint against Davis, alleging, among other things, that Davis had breached the underlying contract and the oral modification. Each party offers a different story to explain what happened during the nine years between the sale of the property and RJT's bankruptcy, and those stories tell of a succession of unrecorded conversations, unwritten agreements, and purported handshake deals not memorialized. Each party contends that it was operating under the arrangement it thought was in place during that time, but what one side asserts, the other often denies. Many points of contention pit one party's word against the other's.

Davis moved for summary judgment on RJT's complaint, primarily on statute of limitations grounds, but also invoking statute of frauds and ripeness as grounds to dismiss certain of the claims. After considering the record in this adversary proceeding, including Davis's motion, RJT's objection, and relevant exhibits; after considering the parties' oral arguments; and after conducting an independent review of applicable law, the Court issues the following Memorandum Decision granting Davis's motion in part and denying it in part.

## I. JURISDICTION

The Court's jurisdiction over this adversary proceeding is properly invoked pursuant to 28 U.S.C. § 1334 and § 157(a) & (c). While this matter is a non-core proceeding, the Court

nevertheless has jurisdiction over it as a related-to proceeding because its outcome "could conceivably have an[] effect on the estate being administered in bankruptcy."[1]

Bankruptcy courts possess authority to hear non-core proceedings that are "otherwise related to a case under title 11," but they cannot enter final orders in such matters unless the parties consent.[2] Although a litigant's consent need not be express—the sine qua non is instead that it be knowing and voluntary[3]—a common way to signal consent is through a simple statement made in a pleading. Rule 7008 requires a complaint to "contain a statement that the pleader does or does not consent to entry of final orders or judgment by the bankruptcy court,"[4] and Rule 7012(b) imposes the same requirement on responsive pleadings.

Neither RJT's complaint nor Davis's answer tracks the precise language of those rules, however. Even so, those documents make the parties' intent clear. The complaint states that RJT "stipulates to the jurisdiction of the Bankruptcy Court," citing the holding of the Supreme Court's decision in *Wellness*.[5] In *Wellness*, of course, the Supreme Court held that there is no constitutional violation when "parties knowingly and voluntarily consent to adjudication by a bankruptcy judge" of a claim that is constitutionally entitled to adjudication by an Article III tribunal.[6] Although the complaint does not use the word consent, no talismanic incantation is required to evince consent. The Court deems RJT's stipulation to this Court's jurisdiction and its citation to *Wellness*—a case

---

[1] *Gardner v. United States (In re Gardner)*, 913 F.2d 1515, 1518 (10th Cir. 1990).

[2] 28 U.S.C. § 157(c). Absent consent, a bankruptcy court is limited to submitting "proposed findings of fact and conclusions of law to the district court," which enters a final order or judgment "after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

[3] *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, ---, 135 S.Ct. 1932, 1947-48 (2015).

[4] Fed. R. Bankr. P. 7008.

[5] Dkt. No. 1, ¶2. All citations to docket entries are, unless otherwise noted, citations to this adversary proceeding.

[6] *Wellness*, 135 S.Ct. at 1939.

that authorized bankruptcy court adjudication of the type of state-law claims at issue here—as RJT's knowing and voluntary consent to this Court entering a final order in this proceeding.

As for Davis's answer, it too does not use the word consent, but, answering the second paragraph of the complaint, states that Davis stipulates to the jurisdiction of this Court. This likewise constitutes knowing and voluntary consent. Therefore, and because neither party has suggested that the Court cannot enter a final order in this proceeding, the foregoing analysis satisfies the Court that it may enter a final order. Venue is appropriate under 28 U.S.C. § 1409.

## II. PROCEDURAL BACKGROUND

The only matter before the Court is Davis's motion for summary judgment, and this decision addresses that motion on the merits after considering RJT's objection thereto. Such an unremarkable procedural posture obscures the circuitous route this proceeding took to reach that destination. A cursory glance at the docket reveals a more complex procedural history, and the Court wishes to clarify how it led to the present before reaching the merits.

RJT commenced this adversary proceeding by filing a complaint against Davis on March 16, 2020. The complaint alleged nine causes of action, all under state law: two for breach of contract and one each for unjust enrichment, fraud, constructive fraud, fraudulent misrepresentation, negligent misrepresentation, laches, and civil conspiracy. Davis answered timely, and matters proceeded initially without incident. The Court entered a scheduling order on May 15, which, among other things, set November 18, 2020 as the fact discovery cut-off date and April 19, 2021 as the dispositive motion deadline.[7]

---

[7] Dkt. No. 5, ¶¶ 3, 5.

The procedural oddities began on August 14, 2020, when RJT filed a document entitled Plaintiff's First Motion for Summary Judgment.[8] The document's caption belied its content, however. With one exception, it cited to no "parts of materials in the record" as required by Rule 56(c)(1), a glaring deficiency for any purported summary judgment motion, but particularly so for one in a case involving a dispute over a contract that was allegedly modified by a handshake deal.[9] Instead, RJT sought summary judgment "based on the pleadings as they exist at this stage of the litigation,"[10] language that, when combined with RJT's failure to cite to evidence in support of its motion, suggested that RJT perhaps intended to seek judgment on the pleadings under Rule 12(c). But this appears unlikely. In the first place, RJT did not invoke that rule. Moreover, while such motions can be made at any time after the pleadings are closed so long as they do not delay trial, they are ordinarily filed "promptly after the close of the pleadings."[11] Here, RJT filed its motion approximately four months after Davis filed his answer. But most importantly, the substance of the motion is inconsistent with the purpose of Rule 12(c). That rule

> is designed to provide a means of disposing of cases when the material facts are not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice. The motion for a judgment on the pleadings only has utility when all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court.[12]

RJT's motion made clear that RJT did not seek a judgment based on the undisputed material facts established through Davis's affirmations and denials of the factual allegations in its complaint.

---

[8] Dkt. No. 6.

[9] In fact, the lone exception is a citation to a single page of an exhibit filed by Davis in a different adversary proceeding that RJT claims supports its right of first refusal. *See* Dkt. No. 4-1 in Adv. Pro. 19-2112, at 11.

[10] Dkt. No. 6, at 3.

[11] 5C Arthur R. Miller et al., Federal Practice and Procedure § 1367 (3d ed. Oct. 2020 update).

[12] *Id.*

Rather, RJT's motion attacked the sufficiency of Davis's answer, arguing that Davis's "blanket denials," failure to present "competing facts," and assertion of defenses without supporting facts[13] meant that the answer failed to meet the standards of *Twombly* and *Iqbal*.[14] As a result, RJT argued that it was entitled to summary judgment on "the only facts plead[ed],"[15] i.e., the allegations in the complaint. Thus, RJT's motion was a procedural chimaera: It presented itself as a summary judgment motion, though without evidence; sounded at times like a Rule 12(c) motion, though contradicted that rule's purposes; and, after essentially arguing that Davis's answer should be disregarded, ultimately sought judgment on the complaint alone.[16]

RJT's motion never came before the Court for adjudication, however, because it was plagued by procedural defects. This Court's Local Rules require that a party seeking summary judgment "obtain and set an appropriate hearing date" for its motion and provide notice to the opposing party of the motion and hearing date along with "a specific objection deadline that is at least 21 days after service" of the notice.[17] RJT failed to follow this procedure; it did not set its motion for hearing and, although Davis's counsel received a copy of the motion through CM/ECF, the Court's case management and electronic filing system, it also did not provide Davis with the requisite notice. As a result, RJT's motion lay inactive on the docket. RJT has repeatedly brought

---

[13] Dkt. No. 6, at 7.

[14] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Courts are split on the issue of whether the pleading standard created by the seminal cases of *Twombly* and *Iqbal* applies to answers. *E.g.*, *Dorato v. Smith*, 163 F.Supp.3d 837, 882 (D.N.M. 2015); 5C Arthur R. Miller et al., Federal Practice and Procedure § 1274 (3d ed. 2020 update) ("[C]ourts are in disagreement as to whether the pleading standard articulated in [*Twombly* and *Iqbal*] extends to the pleading of affirmative defenses.").

[15] Dkt. No. 6, at 7.

[16] In a subsequent filing, RJT elaborated that the purpose of its motion was "to either attempt to prevail on the merits of the existing facts pleaded (i.e., RJT's supplied facts), *or* if the Court were feeling magnanimous toward Davis, to order Davis to go back and resubmit his answer consistent with [*Iqbal*] and [*Twombly*]." Dkt. No. 12, at 4.

[17] Bankr. D. Ut. LBR 7056-1(c).

up Davis's failure to respond to the motion,[18] but since RJT did not follow the correct notice procedures, Davis was under no obligation to do so.

On September 3, 2020, Davis filed his own motion for summary judgment, which he noticed for hearing in compliance with the Local Rules. The notice, which was delivered via CM/ECF to Sarah Larsen, RJT's then-counsel of record in this adversary proceeding, expressly listed September 24, 2020 as the deadline to object to Davis's motion. The notice also contained a standard admonition cautioning RJT that if it or its attorney failed to file an objection or attend the hearing on the motion, "the Bankruptcy Court may decide that you do not oppose the relief sought in the Summary Judgment Motion and may enter an order granting that relief."[19] RJT did not file an objection to the motion, and, at the hearing on the motion, Larsen, professing unfamiliarity with litigation procedures, asserted that she did not know she had to file one.[20]

Although Davis noted that Local Rule 7056-1(m) permitted the Court to grant his motion due to RJT's failure to object, the Court stated that a motion for summary judgment can only be granted if the movant carries his initial burden, regardless of whether an objection was filed. The Court then set a final hearing on the motion and ordered Davis to prepare and file in advance of that hearing proposed findings of fact and conclusions of law showing that he had carried his burden.

Six days before the final hearing, RJT filed a motion to extend the time to object to Davis's summary judgment motion and requested that the Court stay the proceeding for 20-30 days until

---

[18] *See* Audio Recording of October 13, 2020 Hearing, Dkt. No. 11; Audio Recording of November 3, 2020 Hearing, Dkt. No. 17; Dkt. No. 12, at 4.

[19] Dkt No. 10, at 2.

[20] Audio Recording of October 13, 2020 Hearing, Dkt. No. 11. It became clear during the hearing that Larsen was not familiar with the contents of the notice. In an apparent attempt to excuse RJT's failure to object to Davis's motion, she stated her belief that the notice did not contain an objection deadline. After reading a copy, she quickly corrected herself.

it could conduct additional discovery, specifically Davis's deposition and those of "two other[,] less material parties."[21] RJT invoked Rule 56(d) as the basis for this relief, and the motion doubled as the declaration required by that rule. At first glance, there were two conspicuous problems with the motion and declaration. First, RJT did not notice the motion for hearing. Second, the declaration did not appear to fulfill the requirement that Rule 56(d) declarations "must specify '(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment.'"[22]

Two days after filing the motion to extend time, RJT filed its Objection to Defendant's Motion for Summary Judgment.[23] As RJT's current counsel now admits, that document "was essentially a repetition of [the motion to extend time] and did not respond to any of [Defendant's] factual assertions, arguments, or allegations in the motion [for summary judgment]."[24]

The Court conducted the final hearing on the Defendant's motion for summary judgment on November 3, 2020. Approximately half an hour before the commencement of that hearing, Larsen filed a Limited Appearance of Counsel, informing the Court that James Ord III, who had "been helping [her] behind the scenes with her litigation preparation and even made a short appearance during the deposition of Richard Tolbert," would be appearing for that day's hearing and requesting that he be added to the mailing matrix in the case.[25] No party objected to Ord's appearance.

---

[21] Dkt. No. 12, at 3.
[22] *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1249 (10th Cir. 2015) (quoting *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010)).
[23] Dkt. No. 14.
[24] Dkt. No. 18, at 3.
[25] Dkt. No. 16, at 1-2. A "short appearance" is something of an understatement. Ord was an active participant in the deposition from start to finish, asking for clarification, raising objections, and, notably, conducting the cross-examination of Tolbert.

During that hearing, Ord did not address the motion to extend time or the Rule 56(d) declaration, but rather pursued an argument contained in the Plaintiff's motion for summary judgment, which, as noted previously, was not properly before the Court. Namely, he contended that a defendant's answer must present a slate of "alternative facts" to those pleaded in the complaint and satisfy the pleading standard of *Twombly* and *Iqbal*. Davis's failure to present a "substantive answer" meant that the Court could grant summary judgment to RJT or, if it was feeling "magnanimous," require Davis to amend his answer so that it was "coherent."[26] Then Ord advanced an even more curious—and paradoxical—argument, asserting that Davis's filing of a motion for summary judgment under these circumstances necessarily precluded granting summary judgment in Davis's favor. He reasoned that Davis's motion presented the slate of alternative facts that should have been in the answer, which, when compared to RJT's facts alleged in the complaint—which were deemed admitted because Davis did not properly respond to them— created a genuine dispute of material fact. He then requested that the Court accept Davis's motion as an answer so the parties could move forward with the litigation and "stop playing lawyer games."[27]

Of course, this is not how summary judgment works. A plaintiff moving for summary judgment does not prevail without evidence because of purported deficiencies with a defendant's answer. Nor does a plaintiff responding to a motion for summary judgment create a genuine dispute

---

[26] Audio Recording of November 3, 2020 Hearing, Dkt. No. 17.

[27] *Id.* This argument contained echoes of another argument in RJT's Objection to Defendant's Motion for Summary Judgment, namely, that the facts in Davis's motion for summary judgment "were supplied out of sequence in the litigation" and therefore "inadmissible" on summary judgment and should be stricken. Dkt. No. 14, at 5.

of material fact by referring to allegations in a complaint unsupported by evidence.[28] In short, summary judgment is a "battle of evidence, not allegations."[29]

Despite the deficiencies with RJT's motion to extend time and Rule 56(d) declaration, the Court stated that it would not rule on Davis's motion without first addressing RJT's request under Rule 56(d). Therefore, the Court continued the hearing on Davis's motion to December 8 and noted that if RJT intended to seek relief under Rule 56(d), it would have to amend its motion and declaration and set it for hearing. Prior to that hearing, RJT obtained new counsel, who filed a Supplemental Motion for Rule 56(d) Relief and set it for hearing,[30] and filed an objection to Davis's motion for summary judgment.[31] At the December 8 hearing, Davis's counsel indicated that he had no objection to hearing that objection on the merits, which RJT's counsel acknowledged mooted RJT's request for relief under Rule 56(d). Therefore, this Court may address Davis's motion for summary judgment and RJT's opposition thereto on the merits.

## III. FACTUAL BACKGROUND

Based on the record before it, the Court finds that there is no genuine dispute as to the following facts. Gary Davis is the trustee of the Gary E. Davis Revocable Trust Dated October 1, 2008 (Trust). As relevant to this case, the Trust held title to three contiguous parcels of real property in Salt Lake City: one containing the former Wolverine Machine Building (Wolverine Parcel) and two parcels abutting that parcel, one to the west (West Parcel) and the other to the

---

[28] *See L&M Enters., Inc v. BEI Sensors & Sys. Co.*, 231 F.3d 1284, 1287 (10th Cir. 2000) ("The purpose of a summary judgment motion, unlike that of a motion to dismiss, is to determine whether there is *evidence* to support a party's factual claims. Unsupported conclusory allegations thus do not create a genuine issue of fact." (emphasis added)).

[29] *Cliff v. Indianapolis Bd. of Sch. Comm'rs*, No. IP 89-1091-C, 1993 WL 761180, at *2 (S.D. Ind. May 21, 1993).

[30] Dkt. Nos. 18 & 21.

[31] Dkt. No. 22.

north (North Parcel). On March 10, 2009, Davis, as trustee of the Trust, entered into a Real Estate

Purchase Contract (REPC) to sell the Wolverine Parcel and West Parcel (collectively, the

Property) to Gamut Designs or its assigns.[32] The sale was seller-financed; the REPC required

Gamut to make a $3,500 earnest money deposit toward the purchase price of $265,000 and further

provided that, upon closing, which was to occur on or before May 1, 2009, Gamut would enter

into a financing agreement with the Trust.[33] Through the REPC the Trust represented and

warrantied that it was "unaware of violations or alleged violations of any rules, regulations, codes,

resolutions, ordinances, statutes, or laws involving the use, maintenance, operation, or condition

of the Property" and that "all sewer, water, electrical, drains, pipelines, or other mandatory utilities,

are in functional order."[34] The REPC gave Gamut thirty days to perform due diligence on the

Property.[35] The REPC expressly provided that it "may only be modified by a writing executed by

Buyer and Seller."[36]

Attached to the REPC as Exhibit B was a document entitled Description of the Property,

which listed the three parcels by identification number. To the right of the description for the North

Parcel was this handwritten note with a line drawn back to the North Parcel: "First Right of

Refusal."[37] Davis admitted that this handwriting was his and that the parties had agreed that the

purchaser would have a right of first refusal on the North Parcel.[38] There is no other documentation

describing the terms of the right of first refusal.

---

[32] Dkt. No. 9, Ex. A.
[33] *Id.*, ¶¶ 2, 6.
[34] *Id.*, ¶ 12.
[35] *Id.*, ¶ 4.
[36] *Id.*, ¶ 19.
[37] Dkt. No. 9, Ex. A.
[38] Audio Recording of December 8, 2020 Hearing, Dkt. No. 26; *see also* Dkt. No. 22, Ex. 2, Transcript of
Deposition of Gary Davis, at 50:20-52:22.

Richard Tolbert, who had been negotiating on behalf of Gamut, inspected the Property and completed due diligence.[39] Gamut did not attempt to cancel the purchase of the Property based on any findings during the due diligence period. Upon closing, Tolbert stated that RJT, of which Tolbert was the manager and sole owner, would be Gamut's assignee and purchaser under the REPC and would close on the transaction. On May 21, 2009, RJT and the Trust entered into a Note Secured By Deed of Trust (Note) for the $261,500 unpaid balance of the purchase price for the Property, which bore interest at 6% per annum. The Note provided that RJT would pay the Trust $1,000 per month until May 2010, at which time the monthly payment would increase to $1,787.50.[40] On the same day, RJT and the Trust also executed a Deed of Trust With Assignment of Rents (Deed of Trust), which was recorded in the Salt Lake County Recorder's Office on May 22, 2009.[41]

On January 4, 2013, Davis recorded a Notice of Default and Election to Sell (First Notice of Default) in the Salt Lake County Recorder's Office.[42] The First Notice of Default provided that RJT was in default of its "monthly payment obligations" and stated that "[a]ll delinquent monthly payments, together with unpaid taxes, insurance and other obligations under the Straight Note and Deed of Trust are due,"[43] though it did not state what the balance owing was. The document made no reference to a modification to the Note and Deed of Trust. Tolbert received the First Notice of Default.[44]

---

[39] Dkt. No. 8, Ex. A, Transcript of Deposition of Richard Tolbert, at 23:10-18.
[40] Dkt. No. 9, Ex. B.
[41] Dkt. No. 9, Ex. C.
[42] Dkt. No. 9. Ex. E.
[43] *Id.*
[44] Dkt. No. 22, Ex. 3, ¶ 7.

One day prior to the recording of the First Notice of Default, Tolbert filed a chapter 13 petition in this District.[45] His Schedule D listed Davis as a secured creditor with an undisputed claim of $230,811, of which $116,811 was unsecured, and which was incurred pursuant to a seller-financed mortgage in May 2009.[46] On January 29, 2013, Davis filed an objection to confirmation of Tolbert's chapter 13 plan. In that objection Davis noted the recordation of the First Notice of Default and contended that RJT was in default under the terms of the Note "in the amount of $26,936.25."[47] Davis also asserted that Tolbert erroneously asserted a personal interest in the Property in his plan and his statements and schedules and incorrectly listed the amount of the arrearage in the plan.[48] He requested that Tolbert "remove the Property from its Plan or alternatively provide for the correct arrearage amount and provide evidence to the Court of [Tolbert's] ability to pay this arrearage amount along with staying current on the monthly note obligations."[49] Davis withdrew his objection to confirmation on June 11, 2013.[50] Tolbert received a chapter 13 discharge on January 30, 2018.

---

[45] *See* Case No. 13-20062.

[46] Dkt. No. 11 in Case No. 13-20062, at 9.

[47] Dkt. No. 12 in Case No. 13-20062, ¶¶ 5-6. Davis stated that he had received notice of Tolbert's bankruptcy case only after the First Notice of Default had been recorded. *Id.* ¶ 7.

[48] *Id.* ¶¶ 8-11. Tolbert's Schedule A listed a fee simple interest in a business building at 126 West 2700 South, South Salt Lake, UT, which is the street address of the Property. Dkt. No. 11 in Case No. 13-20062, at 3.

[49] *Id.* ¶.

[50] RJT attaches particular significance to the withdrawal of Davis's objection, arguing that Davis withdrew it because Tolbert had reminded Davis that the parties had subsequently modified the Note and that Tolbert was not in default under the modified terms. The reason for Davis's withdrawal of his objection is not clear, however, leaving its significance similarly uncertain. Tolbert made no modifications to the plan or his statements and schedules immediately prior to the withdrawal. On April 19, 2013, nearly two months before Davis withdrew his objection, Tolbert did modify his plan to remove Davis from part 6(d) of the plan. Dkt. No. 26 in Case No. 13-20062, at 2. Part 6(d) of the plan, entitled Curing Defaults and Postpetition Payments, had listed Davis as holding a $20 arrearage claim. Dkt. No. 6 in Case No. 13-20062, at 3. The record is too murky to decipher if this modification caused the withdrawal almost two months later, or whether something else did.

13

On July 6, 2018, Davis recorded a Notice of Default and Election to Sell (Second Notice of Default) in the Salt Lake County Recorder's Office.[51] The Second Notice of Default provided that RJT was in default of its "monthly payment obligations" and stated that "[a]ll delinquent monthly payments, together with unpaid taxes, insurance and other obligations under the Straight Note and Deed of Trust are due,"[52] though it did not state what the balance owing was. The document made no reference to a modification to the Note and Deed of Trust. Tolbert received the Second Notice of Default, and it prompted him to cause RJT to file bankruptcy.[53]

While those facts are undisputed, the Court finds that the following facts are the subject of a genuine dispute. The most important and hotly contested fact is the existence of an oral modification to the REPC and Note, which the parties have occasionally called the Accord.[54] RJT has asserted that shortly after it took possession of the Property in 2009, Tolbert discovered defects with the Property that were inconsistent with the warranties and representations in the REPC as to its condition. To remedy this problem, Davis and Tolbert negotiated an oral agreement within thirty days after RJT took possession of the Property under which Davis would be relieved of his obligation to repair those defects in exchange for a reduction in RJT's monthly payments to $1,000 for the remaining term of the Note.[55] RJT presently asserts that the Accord did not effect a reduction in the principal due under the Note; instead, each $1,000 payment would be considered a full payment with Davis waiving the additional $787.50 required by the Note.[56] The Accord, to the extent it exists, was never memorialized in writing.

---

[51] Dkt. No. 9. Ex. I.
[52] *Id.*
[53] Dkt. No 8, Ex. A, Transcript of Deposition of Richard Tolbert, 58:23-59:6.
[54] The Court will adopt that nomenclature for the sake of consistency.
[55] Dkt. No. 8, Ex. A, Transcript of Deposition of Richard Tolbert, 46:11- 47:25.
[56] Dkt. No. 22, at 7. The assertion that the Accord did not reduce the principal balance gives RJT an explanation for Tolbert's statement in his bankruptcy schedules that the Note's principal balance was $230,811 less than four years after the Accord was reached. Davis has seized on this apparent incongruity

RJT asserts that there was a second oral modification to the Note in January or February 2018. According to RJT, Davis informed Tolbert that he had run into financial difficulties and did not want to carry the Note for ten more years.[57] He requested that RJT increase the monthly payment, and RJT agreed to increase it to $1,500 per month as long as "the additional $500 per month was credited against the principal balance."[58] Davis purportedly assented.

RJT contends that it has never missed a payment under the arrangement reached through the Accord.[59] Davis admits to keeping records of RJT's payments in handwritten notes and ledgers.[60] A review of those documents suggests that RJT paid $1,000 per month to Davis from June 2009 to December 2017, with payments increasing to $1,500 per month beginning in January 2018.[61] RJT also claims that after Davis filed the First Notice of Default, Tolbert reminded him of

---

as proof that the Accord is a fabrication. RJT contends, however, that since the Accord did not alter the principal balance, the parties were still operating under the original amortization schedule for the Note. RJT has provided a copy of that schedule, which shows that the principal balance was $230,811.50 in January 2013. Dkt. No. 22, Ex. 3, Ex. A.

It is possible that the Accord functioned this way, though it would have been a fiction. If the parties agreed to reduce payments to $1,000 for the term of the Note, they necessarily reduced principal and possibly interest as well, even if they did not describe it that way. The original amortization schedule concludes in May 2030. Adding the first twelve months' payments of $1,000 to the $1,787.50 monthly payments for the balance of the Note totals $441,000 in principal and interest. Making $1,000 monthly payments over the same time period totals $252,000, less than the original $261,500 principal balance. There can be no dispute that the Accord, if it exists, not only reduced the total amount necessary to pay off the note, but also reduced the principal balance. RJT's claim that it did not can only be understood as RJT's and Davis's agreement to abide by the fiction that $1,000 payments would amortize the loan as though they were $1,787.50 payments. The Court will therefore characterize the Accord as an agreement that payments would be $1,000 for the term of the Note while the parties would still observe the original amortization schedule.

Notably, RJT's current position contradicts its allegation in the complaint that the Accord "reduc[ed] the principal amount of the Note to approximately $140,000," while interest remained at 6%. Dkt. No. 1, ¶ 13; *see also id.* ¶ 49 (alleging that the Accord "reduce[d] the purchase price of the Property").

[57] Dkt. No. 22, Ex. 3, ¶ 20.

[58] *Id.* ¶¶ 20-21.

[59] *Id.* ¶ 15.

[60] Dkt. No. 9, ¶ 27.

[61] Dkt. No. 9, Exs. G,H, J, K, & L. Davis admits that RJT made $1,000 monthly payments from May 2010 to May 2012, though he asserts that those payments were pursuant to the Deed of Trust and the Affidavit of Payment, not the Accord. *See* Dkt. No. 9, ¶ 22.

the Accord, which caused Davis to admit that the First Notice of Default was a mistake and Davis did not act on it.[62]

Davis, by contrast, denies the existence of the Accord, including the second oral modification. Instead, he asserts that the parties modified the Note, but the modification came in May 2010 and for reasons unrelated to the condition of the Property. At that time, payments under the Note were set to increase to $1,787.50 per month, and Tolbert purportedly informed him that he could not afford the increase and requested that he be allowed to continue with $1,000 monthly payments until he could pay the full amount. To accommodate Tolbert, the parties agreed that payments would remain at $1,000 per month until May 2012, after which time Davis expected RJT to resume the higher payments under the Note. Davis asserts that this agreement was memorialized in an undated document entitled Affidavit of Payment, which was drafted in Davis's handwriting and purportedly signed by Tolbert.[63] In what would appear to be a repudiation of the Accord, the Affidavit of Payment states that "[a]ll past due amounts may be called due and payable at that time consistent with [the Deed of Trust]."[64]

RJT believes that the Affidavit of Payment is not authentic; when presented with it during his deposition, Tolbert repeatedly denied having seen it before.[65] While Davis asserts that Tolbert signed it[66] and Tolbert conceded that the signature on the document looked like his own,[67] RJT contends that the signature may have been a cut-and-paste forgery.[68] RJT further asserts that Davis created the Affidavit of Payment not to memorialize an agreement reached with Tolbert, but rather

---

[62] Dkt. No. 22, Ex. 3, ¶ 11.
[63] Dkt. No. 9, Ex. D.
[64] *Id.*
[65] Dkt. No. 1, Ex. A, Transcript of Deposition of Richard Tolbert, 59:12-61:12.
[66] Dkt. No. 22, Ex. 2, Transcript of Deposition of Gary Davis, at 53:4-22, 55:24-57:14.
[67] Dkt. No. 1, Ex. A, Transcript of Deposition of Richard Tolbert, 59:15-21.
[68] Dkt. No. 22, Ex. 1.

so that he could offer it to a lending institution as proof that he had been receiving payments and thereby qualify for a loan. In his deposition, Davis admitted that he had created the Affidavit of Payment in January 2012 for this purpose.[69]

Davis also asserts that in May 2013, while Tolbert was in bankruptcy, he and Tolbert agreed that payments under the Note would remain at $1,000 per month until the termination of his bankruptcy case, at which time he would become current on all past due amounts.[70] This agreement does not appear to have been memorialized in writing, and RJT denies its existence. Davis further states that he approached Tolbert in September 2017 and requested that RJT bring the outstanding balance under the Note current by January 2018, when Tolbert was scheduled to receive his discharge. RJT denies that this conversation took place.[71] In January 2018, around the time Tolbert received his discharge, Davis contends that Tolbert informed him that he was unable to resume the higher payments required by the Note but could make payments of $1,500 per month.[72]

## IV. DISCUSSION

### A. Legal Standard Under Rule 56

Under Federal Rule of Civil Procedure 56(a), made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled

---

[69] *Id.*, Ex. 2, Transcript of Deposition of Gary Davis, at 53:4-57:14.
[70] Dkt. No. 9, ¶ 12.
[71] Dkt No. 22, Ex. 3, ¶ 18.
[72] Dkt. No. 9, ¶¶ 13-14. Of course, Davis's version of the events of January 2018 conflicts with RJT's telling, in which the parties were operating under the Accord when Davis, who in that story was the party undergoing financial troubles, came to Tolbert asking him to increase the monthly payments for Davis's benefit.

to judgment as a matter of law."[73] Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[74] Whether a dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."[75] In sum, the Court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial."[76]

The moving party bears the burden to show that it is entitled to summary judgment,[77] including the burden to properly support its summary judgment motion as required by Rule 56(c).[78] If the moving party has failed to meet its burden, "summary judgment must be denied," and the nonmoving party need not respond because "no defense to an insufficient showing is required."[79] Where a defendant seeks

> summary judgment on the basis of an affirmative defense, "the defendant must demonstrate that no disputed material fact exists regarding the affirmative defense asserted. If the defendant meets this initial burden, the plaintiff must then demonstrate with specificity the existence of a disputed material fact. If the plaintiff fails to make such a showing, the affirmative defense bars [its] claim, and the defendant is then entitled to summary judgment as a matter of law."[80]

The nonmoving party may not rely solely on allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."[81] The nonmoving party

---

[73] Fed. R. Civ. P. 56(a).

[74] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[75] *Id.*

[76] *Id.* at 249.

[77] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[78] *See Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).

[79] *Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

[80] *Johnson v. Riddle*, 443 F.3d 723, 724 n.1 (10th Cir. 2006) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997)).

[81] *Celotex*, 477 U.S. at 324.

also "must do more than simply show that there is some metaphysical doubt as to the material facts."[82]

When considering a motion for summary judgment, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party,[83] but the Court does not weigh the evidence or make credibility determinations.[84]

## B. RJT's Claims Remaining for Adjudication

RJT concedes that Davis is entitled to summary judgment on its claims for constructive fraud, fraudulent misrepresentation, and negligent misrepresentation.[85] The Court will therefore grant summary judgment to the Defendant on those claims and will dismiss them with prejudice. That leaves RJT's two breach of contract claims—one relating to the Property and the other to the North Parcel—and claims for unjust enrichment, fraud, laches, and civil conspiracy remaining for adjudication.

Davis argues that the breach of contract claim pertaining to the North Parcel and the civil conspiracy claim should be dismissed without prejudice because they are not ripe and lack an essential element, respectively. As regards the breach of contract claim pertaining to the Property, the unjust enrichment claim, the fraud claim, and the laches claim, Davis argues that he is entitled to summary judgment dismissing these claims with prejudice because they were brought beyond the statute of limitations applicable to each of them. In response, RJT contends that the discovery rule tolled the relevant statutes and the claims are timely. Because the law regarding when the

---

[82] *Matsushida Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[83] *E.g.*, *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citation omitted).
[84] *Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358 F.3d 736, 742-43 (10th Cir. 2004) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994)).
[85] Dkt. No. 22, at 17.

discovery rule operates to toll a statute of limitations applies to many of these claims, the Court

will discuss it here for efficiency's sake.

"As a general rule, a statute of limitations begins to run 'upon the happening of the last

event necessary to complete the cause of action.'"[86] Utah recognizes, however, two forms of the

discovery rule, which may toll a statute of limitations "until the discovery of facts forming the

basis for the cause of action."[87] The first is the statutory discovery rule, which, as its name suggests,

"involves situations in which a relevant statute of limitations, by its own terms, mandates

application of the discovery rule."[88] The second is the equitable discovery rule, which only applies

if the applicable statute of limitations does not contain a statutory discovery rule.[89] The equitable

discovery rule tolls a statute of limitations only in these "two situations: (1) 'where a plaintiff does

not become aware of the cause of action because of the defendant's concealment or misleading

conduct,' and (2) 'where the case presents exceptional circumstances and the application of the

general rule would be irrational or unjust, regardless of any showing that the defendant has

prevented the discovery of the cause of action.'"[90] Of particular relevance to this case, additional

rules govern the application of the "concealment version" of the equitable discovery rule:

> [It] does not automatically operate to toll the limitations period until the plaintiff's
> actual or constructive discovery of his or her claim. Rather, the rule requires an
> evaluation of the reasonableness of a plaintiff's conduct in light of the defendant's
> fraudulent or misleading conduct. This is because invocation of the rule is
> essentially a claim of equitable estoppel, whereby a defendant who causes a delay
> in the bringing of a cause of action is estopped from relying on the statute of
> limitations as a defense to the action. Given the rule's genesis in estoppel,

---

[86] *Russell Packard Dev., Inc. v. Carson*, 108 P.3d 741, 746 (Utah 2005) (quoting *Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981)).

[87] *Id.* (quoting *Hill v. Allred*, 28 P.3d 1271, 1275 (Utah 2001)).

[88] *Id.* (citation omitted).

[89] *Id.* at 746-47.

[90] *Id.* at 747 (quoting *Walker Drug Co. v. La Sal Oil Co.*, 902 P.2d 1229, 1231 (Utah 1995)); *see also Colosimo v. Roman Catholic Bishop of Salt Lake City*, 156 P.3d 806, 811 (Utah 2007) ("The statute may be tolled under the equitable discovery rule when either exceptional circumstances or the defendant's fraudulent concealment prevents the plaintiff from timely filing suit.").

application of the concealment version of the discovery rule requires a demonstration that the party seeking to exercise the rule has acted in a reasonable and diligent manner. In order to meet this reasonableness standard, a plaintiff must demonstrate that, given the defendant's actions, a reasonable plaintiff would not have brought suit within the statutory period.

> . . . .

> . . . [O]nce a defendant has affirmatively established that a plaintiff filed his or her claim outside a statute of limitations period, there are two instances in which a plaintiff may raise the concealment version of the discovery rule to toll the statute of limitations until the plaintiff's actual or constructive discovery, whichever is earlier, of the facts forming the basis for the cause of action. First, a plaintiff may successfully toll a statute of limitations by showing that, given the defendant's concealment of the plaintiff's cause of action, the plaintiff neither discovered nor reasonably should have discovered the facts underlying the cause of action before the limitations period expired. Once a plaintiff makes this showing, the concealment version of the discovery rule will operate to toll the relevant statute of limitations, and the limitations period will not commence until the date the plaintiff possessed actual or constructive knowledge of the facts forming the basis of his or her cause of action. Using the four-year statute of limitations at issue in this case for illustration, a plaintiff who neither knew nor should have known of his or her cause of action until *after* the four-year limitations period expired would receive four years from the date of actual or constructive discovery within which to file a claim.

> Second, if a plaintiff either knew or reasonably should have known of the facts underlying his or her cause of action *before* a limitations period expired, the plaintiff may nevertheless invoke the concealment version of the discovery rule. However, for the rule to excuse a plaintiff's failure to file within the fixed limitations period in these circumstances, a plaintiff must show that, given the defendant's actions, the plaintiff acted reasonably in failing to file suit before the limitations period expired. To make this showing, a plaintiff must demonstrate that a reasonably diligent plaintiff would not necessarily have filed a complaint within the limitations period; or said another way, that a reasonable plaintiff may have delayed in filing his or her claim until after the limitations period expired. If a plaintiff makes this showing, the concealment version of the discovery rule will operate to toll the limitations period until the point at which the plaintiff either discovered or reasonably should have discovered the relevant facts forming the basis of the cause of action. If a plaintiff cannot make this showing, however, the concealment version of the discovery rule will not operate to toll the statute of limitations, and the plaintiff's claim will be barred.[91]

---

[91] *Russell Packard Dev., Inc.*, 108 P.3d at 747-49 (citations and internal quotation marks omitted).

## C. The Breach of Contract Claim on the Property

RJT's breach of contract claim on the Property is actually composed of two alternative claims, one for breach of the REPC, the other for breach of the alleged Accord. The breach of the REPC claim alleges that Davis did not deliver the Property in the condition warrantied in the REPC or failed in his obligation to repair it.[92] The breach of the Accord claim alleges that Davis, after agreeing to a lower purchase price for the Property in exchange for being relieved of the obligation to make repairs, wrongfully declared default in 2018. Of course, the two claims are in tension—if there was in fact an Accord that terminated Davis's duty to deliver the Property in the warrantied condition or make necessary repairs, RJT could not sue for violation of those duties. That is why RJT pleaded them in the alternative.[93] The Court will address them in turn.

The REPC is a contract, and the statute of limitations on a breach of contract claim is six years.[94] That statute would begin to run on the breach of the REPC claim when that claim accrued, and a claim accrues under Utah law "upon the happening of the last event necessary to complete the cause of action."[95] Put another way, "[a] cause of action arises 'when it becomes remediable in the courts,' which normally occurs when 'all elements of a cause of action come into being.'"[96] A breach of contract claim requires "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[97]

---

[92] Dkt. No. 1, ¶¶ 32-33.

[93] *See* Dkt. No. 1, ¶ 34 ("Either Davis did make an Accord with RJT to have RJT purchase the property for a lesser price, or Davis has been in default of his obligations to repair the Property for the length of the contract of over 10 years and RJT has made the necessary improvements and/or used the [P]roperty without them to its detriment.").

[94] Utah Code Ann. § 78B-2-309(1)(b) (2020).

[95] *Pinder v. Duchesne County Sheriff*, 478 P.3d 610, 619 (Utah 2020) (quoting *Russell Packard Dev., Inc.*, 108 P.3d at 746).

[96] *Gressman v. State*, 323 P.3d 998, 1004 (Utah 2013) (quoting *Davidson Lumber Sales, Inc. v. Bonneville Inv., Inc.*, 794 P.2d 11, 19 (Utah 1990)).

[97] *Carmichael v. Higginson*, 402 P.3d 146, 149 n.5 (Utah Ct. App. 2017) (citation and internal quotation marks omitted).

RJT asserts that it discovered that the Property was not in the condition as warrantied in the REPC within 30 days of closing. Upon that discovery, which occurred sometime in 2009, RJT''s claim for breach of the REPC accrued. At that time there was a contract, RJT or its assignor had performed by making the earnest money deposit, Davis had breached by failing to deliver the Property in the condition warrantied, and RJT suffered damages as a result. Therefore, the statute of limitations commenced in 2009 and ran in 2015. As a result, the statute of limitations bars recovery on RJT's claim for breach of the REPC.

RJT's claim for breach of the Accord is complicated by RJT's admission that the Accord was exclusively an oral agreement. Davis first argues that the Accord violates the REPC's express language prohibiting modifications other than in writing. But that provision in the REPC does not render subsequent oral modifications unenforceable. Utah law recognizes that "parties to a written agreement may . . . modify a written agreement through verbal negotiations subsequent to entering into the initial written agreement, even if the agreement being modified unambiguously indicates that any modifications must be in writing."[98] The enforceability of an oral modification to a written contract turns on the parties' intentions,[99] and in this case that boils down to the existence of the Accord. Intent is notoriously difficult to parse on summary judgment as a general rule;[100] determining on summary judgment whether the parties entered into the Accord and on what terms is not possible. As a result, the REPC's express prohibition against oral modifications does not bar RJT's breach of contract claim on the Accord.

---

[98] *R.T. Nielson Co. v. Cook*, 40 P.3d 1119, 1124, n.4 (Utah 2002) (citations omitted).

[99] *Createrra, Inc. v. Sundial, LC*, 304 P.3d 104, 109 (Utah Ct. App. 2013).

[100] *See Mendenhall v. Koch Serv., Inc.*, Nos. 93-5072, 93-5073, 1994 WL 556893, at *3 (10th Cir. Oct. 12, 1994) (unpublished) ("[I]ssues of motive and intent are ill-suited for resolution on summary judgment.").

23

Davis also argues that the statute of frauds bars the breach of contract claim on the Accord. In response, RJT contends that two exceptions operate to take the Accord out of the statute of frauds: promissory estoppel and performance.[101] Because statute of frauds is an affirmative defense,[102] Davis's burden on summary judgment is to show that "no disputed material fact exists" regarding its application.[103]

"Statutes of frauds are intended to bar enforcement of certain agreements that the law requires to be memorialized in writing."[104] Contracts for the sale of real property are among the types of agreements that must be in writing.[105] "The rule is well settled in Utah that if the original agreement is within the statute of frauds, a subsequent agreement that modifies any of the material parts of the original must also satisfy the statute."[106]

There is no dispute that the REPC, as a contract for the sale of real property, falls within the statute of frauds.[107] Since the Accord purports to modify the amount of the monthly payment—a material term—it must satisfy the statute, and there is also no dispute that it cannot do so as an

---

[101] RJT's prior counsel had advanced the argument that Davis's handwritten ledgers "effectively recorded the terms of [the Accord]," Dkt No. 14, at 2, implying that the ledgers could satisfy the statute of frauds. While the argument did not appear persuasive, the Court does not have occasion to address it since RJT's current counsel has not pursued it.

[102] Fed. R. Civ. P. 8(c)(1).

[103] *Johnson*, 443 F.3d at 724, n.1.

[104] *Coleman v. Stuart*, 451 P.3d 658, 664 (Utah Ct. App. 2019) (quoting *Golden Meadows Props., LC v. Strand*, 241 P.3d 375, 382 (Utah Ct. App. 2010)).

[105] *See Orton v. Carter*, 970 P.2d 1254, 1259 (Utah 1998) ("In Utah, the statute of frauds requires that no interest in real property shall be created otherwise than by a conveyance in writing signed by the party creating the interest." (citing Utah Code Ann. § 25-5-1)); *Wilberg v. Hyatt*, 285 P.3d 1249, 1253 (Utah Ct. App. 2012) ("Typically, the statute of frauds prohibits the enforcement of oral contracts for the conveyance of property."); *see also* Utah Code Ann. § 25-5-3 (2020) ("Every contract . . . for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party by whom the . . . sale is to be made, or by his lawful agent thereunto authorized in writing.").

[106] *Allen v. Kingdon*, 723 P.2d 394, 396 (Utah 1986) (citing *Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 732 (Utah 1985)).

[107] *See Eldridge v. Farnsworth*, 166 P.3d 639, 648 (Utah Ct. App. 2007) ("[I]nitial contracts and modifications to existing contracts for the sale of land fall within the statute of frauds.").

oral modification to the REPC. Absent an exception that removes the Accord from the statute of frauds, the statute will bar enforcement of the Accord, entitling Davis to summary judgment on RJT's breach of contract claim on the Property. The Court will address RJT's asserted exceptions in turn.

Promissory estoppel applies "only in very rare circumstances[] to avoid the statute of frauds."[108] The exception

> cannot be predicated upon the mere failure to perform a promise or contract which is unenforceable under the statute of frauds, as such a rule would virtually eviscerate the effect of the statute. Rather, in order to establish the promissory estoppel exception to the statute of frauds, the acts and conduct of the promissor must so clearly manifest an intention that he will not assert the statute that to permit him to do so would be to work a fraud upon the other party.[109]

In short, a "defendant is estopped from asserting the statute of frauds as a defense only when he or she has expressly and unambiguously waived the right to do so."[110] As a general rule, "estoppel will not arise simply because of a breach of promise as to future conduct or because of a disappointment of expectations on an executory agreement."[111]

After reviewing the record, the Court concludes that Davis has carried his burden to show that no disputed material fact exists regarding the application of the statute of frauds to the Accord, and RJT has failed to carry its burden to come forward with specific facts that would create a genuine dispute on whether the promissory estoppel exception applies. Put succinctly, RJT has not

---

[108] *Id.* at 649 (citing *Fericks v. Lucy Ann Soffe Trust*, 100 P.3d 1200, 1204 (Utah 2004)).

[109] *Fericks*, 100 P.3d at 1204 (citations and internal quotation marks omitted); *see also Stangl v. Ernst Home Center, Inc.*, 948 P.2d 356, 365 (Utah Ct. App. 1997) ("Parties to contract negotiations should be entitled to rely on the statute of frauds absent a clear manifestation of intent to claim no reliance. A party concerned about the assertion of the statute of frauds could easily protect itself by demanding written commitments before acting in reliance on the negotiations.").

[110] *Stangl*, 948 P.2d at 361.

[111] *Id.* at 361 (quoting *Ravarino v. Price*, 260 P.2d 570, 577 (Utah 1953)).

identified facts that would show that Davis "clearly, expressly, and unambiguously waived [his] right to assert the statute of frauds as a defense in an action seeking to enforce [the Accord]."[112]

As for the part performance exception, Utah has recognized that oral agreements that would otherwise be voided by the statute of frauds can be enforceable "where a party has changed position by performing an oral modification so that it would be inequitable to permit the other party to found a claim or defense on the original agreement as unmodified."[113] To take an oral agreement out of the statute of frauds pursuant to the part performance exception, "[a] court must find (1) that there was such an agreement, (2) that there had been part or full performance, and (3) that there was reliance thereon."[114] In particular, "[t]he part performance doctrine requires that the 'oral contract and its terms must be clear and definite' and that the 'acts done in performance of the contract must be equally clear and definite' and 'must be done in reliance on the contract.'"[115] The reliance prong's requirements "are most stringent where the existence of the oral contract is uncertain, that is, where neither independent acts nor an admission of the contract affirmatively demonstrate that an oral contract existed."[116]

Viewing the evidence in the light most favorable to RJT, the Court concludes that there is a genuine dispute of material fact on each of the elements of RJT's asserted part performance exception and that this precludes granting summary judgment to Davis on his statute of frauds defense. The existence of the Accord itself is the subject of a genuine dispute and RJT has

---

[112] *Eldridge*, 166 P.3d at 649 n.12.

[113] *Allen*, 723 P.2d at 396 (citing *White v. Fox*, 665 P.2d 1297, 1301 (Utah 1983)); *see also Iota, LLC v. Davco Mgmt.Co.*, 284 P.3d 681, 689 (Utah Ct. App. 2012) ("Where there is evidence of part performance under the modified agreement, and where it would be inequitable to permit a party to repudiate the oral modification and seek enforcement of the written contract, the oral agreement may be removed from the statute of frauds and enforced." (quoting *Fisher v. Fisher*, 907 P.2d 1172, 1177 (Utah Ct. App. 1995))).

[114] *Orton*, 970 P.2d at 1259 (citing *Wells v. Marcus*, 480 P.2d 129, 130 (Utah 1971)).

[115] *Wilberg*, 285 P.3d at 1253 (quoting *Martin v. Scholl*, 678 P.2d 274, 275 (Utah 1983)).

[116] *Iota, LLC*, 284 P.3d at 689 (citing *Martin*, 678 P.2d at 277-78).

presented evidence suggesting that it performed, at least in part, the payment terms of that agreement, and relied thereon.

As result, the only matter remaining for trial on RJT's breach of contract claim on the Property is whether RJT can prove the performance exception and defeat Davis's statute of fraud defense to RJT's breach of contract claim on the Accord.

## D. The Breach of Contract Claim on the North Parcel

RJT's breach of contract claim on the North Parcel concerns Davis's alleged attempt to sell the North Parcel to a third party in 2019 without giving RJT an opportunity to match the offer in violation of the right of first refusal. Davis admits to entering into a written contract in August 2019 to sell the North Parcel to David Johnson, but asserts that he subsequently terminated the agreement.[117] Tolbert claims that when he discovered the attempted sale, he caused a notice to be filed against the North Parcel on September 4, 2019, which Davis considers to be a wrongful lien.

This dispute is also the subject of a separate adversary proceeding filed by Davis, as trustee of the Trust, against RJT.[118] Through the complaint, Davis seeks a declaratory judgment that the North Parcel is not property of RJT's bankruptcy estate and an order nullifying the lien and enjoining RJT from filing any further liens.[119] The parties stipulated to stay that proceeding pending resolution of certain issues in RJT's main bankruptcy case.[120]

At oral argument, Davis represented that the North Parcel is not currently under contract. RJT accepted that representation and acknowledged that if that were the case, RJT would have no damages. RJT also stated that as long as the notice remains recorded against the North Parcel, this claim could be addressed at another time. Based on these statements, the Court concludes that

---

[117] Dkt. No. 18, Ex. A, Ex. 1, Transcript of Deposition of Gary Davis, at 148:14-150:6.
[118] Adv. No. 19-2112.
[119] Dkt. No. 1 in Adv. No. 19-2112.
[120] Dkt. No. 10 in Adv. No. 19-2112.

RJT's breach of contract claim on the North Parcel can be addressed at another time, perhaps in the context of Adv. No. 19-2112.

**E. The Unjust Enrichment Claim**

RJT's unjust enrichment claim, like the first breach of contract claim, arises out of the asserted condition of the Property at the time RJT bought it. The complaint alleges that Davis was obligated to make certain improvements to the Property, but that, in consideration for a reduction in the purchase price under the Accord, Davis would be relieved of that obligation and RJT would make the improvements itself.[121] RJT did so and also had the Property re-zoned twice. RJT asserts that if Davis were permitted to enforce the terms of the Note, he would be unjustly enriched by approximately $150,000.[122]

"A claim for unjust enrichment is subject to a four-year statute of limitations."[123] The relevant statute does not contain a statutory discovery rule, so if it is tolled, it must be under the equitable discovery rule.

For purposes of his motion for summary judgment, Davis's statute of limitations defense to the unjust enrichment claim turns on the First Notice of Default. He argues that the recording of that notice on January 4, 2013 and subsequent service on Tolbert commenced the statute of limitations because it placed RJT "on actual notice that Davis did not believe there was an Accord."[124] As a result, the statute would have expired in January 2017, well before RJT commenced this adversary proceeding.

---

[121] Dkt. No. 1, ¶ 42.
[122] *Id.* ¶¶ 43-44.
[123] *Sumsion v. Bay Harbor Farm, LC*, 427 P.3d 511, 520 (Utah Ct. App. 2018) (citing Utah Code Ann. § 78B-2-307(3) (2017)).
[124] Dkt. No. 8, at 15.

28

In response, RJT relies on the discovery rule and argues that Davis later claimed that the recording of the First Notice of Default was a mistake and did not act on it and also withdrew his objection to confirmation of Tolbert's chapter 13 plan. Therefore, RJT contends that Davis's "actions were such that RJT did not discover [he] would not honor the terms of the agreement until early 2018."[125]

RJT does not specify which version of the discovery rule it relies on to toll the four-year statute of limitations, but since it does not argue exceptional circumstances and because its argument is based on Davis's purported deceptive disavowal of the First Notice of Default and withdrawal of his objection to Tolbert's chapter 13 plan, the Court assumes that RJT intends to rely on the fraudulent concealment arm of the equitable discovery rule. That arm is itself divided into two categories based on whether the plaintiff learns of the facts underlying its claim before or after the expiration of the statutory period.

The Court concludes that the recordation of the First Notice of Default provided RJT notice of the facts underlying its unjust enrichment claim. By declaring default on the Note and Deed of Trust, Davis signaled that he did not intend to abide by the Accord. Under these circumstances, the question is whether RJT acted reasonably in failing to file suit before the limitations period expired in January 2017. RJT "must demonstrate that a reasonably diligent plaintiff would not necessarily have filed a complaint within the limitations period; or said another way, that a reasonable plaintiff may have delayed in filing [its] claim until after the limitations period expired."[126]

The Court concludes that there is a genuine dispute of material fact on this point. Viewing the evidence in the light most favorable to RJT, a reasonably diligent plaintiff may not have filed

---

[125] Dkt. No. 22, at 20.
[126] *Russell Packard Dev., Inc.*, 108 P.3d at 748.

suit after receiving the First Notice of Default if Davis had shortly thereafter disavowed it as a

mistake and declined to act on it. The Court needs additional factual detail surrounding Davis's

purported disavowal and withdrawal of his objection to Tolbert's chapter 13 plan to determine

whether his conduct was fraudulent or misleading such that a reasonable plaintiff would have been

dissuaded from filing a complaint until 2018.

## F. The Fraud Claim

Similar to the breach of contract claim on the Property, RJT's fraud claim is composed to

two claims, one regarding the execution of the REPC, the other regarding the execution of the

Accord. Concerning the former, RJT alleges that Davis "committed fraud when he lied about the

condition of the Property in order to get RJT to sign [the REPC.]"[127] The latter claim alleges that

Davis committed fraud "when, in order to induce RJT to continue in [the REPC] despite the

defective condition of the Property, he made an Accord with RJT to . . . relieve himself of

obligations to repair the defects . . . without intention of following through with that Accord."[128]

The statute of limitations on a fraud claim is three years and it contains a statutory discovery

rule, which provides that "the cause of action does not accrue until the discovery by the aggrieved

party of the facts constituting the fraud."[129] Therefore, the discovery rule applies to RJT's fraud

claim "by virtue of the statute," and the relevant question is when RJT "either discovered or should

have discovered [its fraud claim], thereby triggering the running of the statute of limitations."[130]

"A plaintiff is deemed to have discovered his action when he has actual knowledge of the fraud

---

[127] Dkt. No. 1, ¶ 48.
[128] *Id.* ¶ 49.
[129] Utah Code Ann. § 78B-2-305(3) (2020).
[130] *Russell Packard Dev., Inc.*, 108 P.3d at 746 (citation and internal quotation marks omitted).

'or by reasonable diligence and inquiry should know, the relevant facts of the fraud perpetrated against him.'"[131]

With respect to the fraud claim related to the execution of the REPC, RJT had actual knowledge of the alleged fraud when Tolbert discovered the condition of the Property was not what he had bargained for in the REPC. Since RJT admits that Tolbert found defects with the Property within thirty days after taking possession of the Property, RJT's fraud claim accrued, and the statute of limitations began running, in 2009. The statute expired in 2012, barring RJT's fraud claim based on the execution of the REPC.

As regards the fraud claim related to the execution of the Accord, RJT contends that it did not discover Davis's fraud until sometime in early 2018, when Davis notified RJT that the outstanding balance on the Note was $276,086.35, which revealed that Davis had not intended to honor the Accord.[132] As with the unjust enrichment claim, Davis argues that the First Notice of Default put RJT on notice of any potential fraud claim.

The Court agrees with Davis. The First Notice of Default stated that Davis was declaring default under the terms of the Note and Deed of Trust and, among other things, asserting that the unpaid principal balance was accelerated and now due. RJT points to the absence of a number reflecting the balance or the amount in default and suggests that such absence is material. Even without such figures, however, the First Notice of Default, with its exclusive reference to the Note and Deed of Trust as the operative agreements between the parties and conspicuous omission of the Accord, was more than sufficient to indicate to RJT that Davis did not intend to honor the Accord. The First Notice of Default therefore provided RJT with knowledge of the facts

---

[131] *Colosimo*, 156 P.3d at 811 (quoting *Baldwin v. Burton*, 850 P.2d 1188, 1196 (Utah 1993)).
[132] Dkt. No. 22, Ex. 3, at 23.

constituting its fraud claim, commencing the statute of limitations to run in 2013. Since that statute

expired in 2016, RJT's fraud claim related to the execution of the Accord is also time-barred.

Whether Davis represented that the First Notice of Default was a mistake or whether he

failed to act on it does not alter this conclusion. The presence of a statutory discovery rule precludes

application of the equitable discovery rule to RJT's fraud claim. Therefore, the reasonableness of

RJT's conduct in light of Davis's alleged fraudulent or misleading conduct and the question of

whether application of the statute of limitations would be irrational or unjust are not at issue here.

## G. The Laches Claim

RJT's laches claim appears to reverse the normal order of things. Laches is not a claim, but

"an equitable defense which arises in cases where the plaintiff seeks equitable relief. A defendant

may successfully assert this defense when a plaintiff seeking equity unreasonably delays in

bringing an action and this delay prejudices the defendant."[133] The Court understands the general

tenor and intent of the claim, however. Much like RJT's unjust enrichment claim, itself rooted in

equity and designed to provide a remedy where none exists at law,[134] RJT's laches claim argues

that it would be unfairly harmed if Davis were allowed to seek to enforce the Note after so many

years when RJT believed that the parties were operating under the Accord. In this way, RJT's

claim, reduced to its pith, shares the same foundation as laches: "considerations of time and injury.

Laches in legal significance is not mere delay, but delay that works a disadvantage to another."[135]

---

[133] *DOIT, Inc. v. Touche, Ross & Co.*, 926 P.2d 835, 845 (Utah 1996) (citations omitted). The Court notes that since "Utah has abolished any formal distinction between law and equity," laches may apply to actions at law even though it is an equitable defense. *Veysey v. Nelson*, 397 P.3d 846, 848 (Utah Ct. App. 2017) (quoting *Borland v. Chandler*, 733 P.2d 144, 146 (Utah 1987)).
[134] *E.g.*, *Selvig v. Blockbuster Enters., LC*, 266 P.3d 691, 698 (Utah 2011).
[135] *Insight Assets, Inc. v. Farias*, 321 P.3d 1021, 1025 (Utah 2013) (quoting *Mawhinney v. Jensen*, 232 P.2d 769, 773 (Utah 1951)).

The sole basis asserted by Davis in his motion to grant summary judgment on this laches claim is statute of limitations. Asking what statute of limitations applies to laches seems like an oxymoron. Due to the similarities between RJT's laches claim and its unjust enrichment claim, however, the Court will deny Davis's motion for summary judgment on the laches claim for the same reasons outlined in the discussion on the unjust enrichment claim.

## H. The Civil Conspiracy Claim

RJT's civil conspiracy claim is closely linked with its breach of contract claim on the North Parcel. The pith of the claim is that Davis conspired with at least one other person to attempt to sell the North Parcel to that other person without offering RJT its right of first refusal. Civil conspiracy has five elements under Utah law: "(1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof."[136] Davis argues that he is entitled to summary judgment on RJT's civil conspiracy claim because RJT has not identified a second party to the conspiracy and therefore has failed to satisfy an essential element of the claim. In response, RJT contends that, after engaging in discovery, it has now identified the second party as David Johnson. Davis did not rebut this argument in his reply brief, asserting only that the Court should dismiss the civil conspiracy claim without prejudice.

A defendant in Davis's position may carry his initial burden on summary judgment "by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial."[137] By pointing to the lack of an identified co-conspirator, Davis shifted the burden to RJT to come forward with evidence to create a genuine dispute that Davis had in fact conspired with

---

[136] *Peterson v. Delta Air Lines, Inc.*, 42 P.3d 1253, 1257 (Utah Ct. App. 2002) (citation and internal quotation marks omitted).
[137] *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002) (citing *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1103-04 (9th Cir. 2000)).

someone. RJT then carried its burden by disclosing Johnson as the alleged co-conspirator. As a result, and because Davis challenged the evidentiary sufficiency only of the first element of the civil conspiracy claim, Davis is not entitled to summary judgment on this claim.

## V. CONCLUSION

The Court will grant Davis's motion for summary judgment in part and deny it in part. The Court will grant the motion on RJT's claims for fraud, constructive fraud, fraudulent misrepresentation, and negligent misrepresentation, and the portion of the breach of contract claim on the Property that alleges a breach of the REPC. The Court will deny the motion on the unjust enrichment, laches, and civil conspiracy claims, and the portion of the breach of contract claim on the Property that alleges a breach of the Accord. The Court further suggests that the breach of contract claim on the North Parcel may be better addressed in the context of the adversary proceeding dealing more directly with the right of first refusal. The Court will issue a separate Order and Judgment in accordance with this Memorandum Decision.

_____END OF DOCUMENT_____

_____oooOooo_____

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

| | |
|---|---|
| P. Matthew Cox | bankruptcy_pmc@scmlaw.com, beckcasaday@hotmail.com |
| Sarah J. Larsen | Sarah.larsen@utahbankruptcylawcenter.com, admin@utahbankruptcylawcenter.com, sarah.larsen@ecf.courtdrive.com |
| Jeremy C. Sink | jsink@kmclaw.com, mbridges@kmclaw.com |

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

- None.